## AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY
### (Hidden Valley Golf Course)

THIS AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY (this "Agreement") is made and entered into by and between the parties herein identified as of the Effective Date (as that term is defined below).

1.  Definitions. The following terms shall have the meanings indicated for all purposes affecting this Agreement.

    a.  Closing. The term "Closing" shall mean and refer to the settlement of the purchase and sale of the Property by Seller to Purchaser pursuant to this Agreement.

    b.  Closing Agent. The term "Closing Agent" shall mean and refer to Chicago Title Insurance Company, 601 Riverside Avenue, Jacksonville, Florida 32204.

    c.  Concurrency Approvals. The term "Concurrency Approval" shall mean and refer to that Satisfaction of all concurrency requirements, including but not limited to transportation, water, sewer, reuse, fire, police and education capacity, have been satisfied and reserved in such a manner so that solely upon the payment of applicable impact fees no concurrency requirement will (i) prevent or materially impair the proposed construction of the Development in accordance with the to be approved engineering plans and the issuance of a certificate of completion for the Development, and (ii) prevent or materially impair Purchaser from obtaining building permits and certificates of occupancy for single-family homes on the Lots. The Concurrency Approval shall not be deemed final until all appeal periods related thereto have expired and any appeals filed have been finally determined favorably to Purchaser.

    d.  Development. The term "Development" shall mean and refer to the proposed single family, detached residential community which Purchaser contemplates developing on the Property.

    e.  Environmental Law(s). The term "Environmental Law(s)" shall mean and refer to (i) the Resource Conservation and Recovery Act, as amended, restated or supplanted, and any rules or regulations promulgated, adopted or incorporated thereunder; (iii) the Comprehensive Environmental Response, Compensation and Liability Act, as amended, restated or supplanted, and any rules or regulations promulgated, adopted or incorporated thereunder; and (iii) any local, state or federal law, statute, ordinance, rule, code, regulation, order, decree or judgment pertaining to environmental regulation, production, storage, transportation, use, control, development, disposal, contamination, remediation or clean-up of any Hazardous Materials.

    f.  Escrow Agent. The term "Escrow Agent" shall mean and refer to Chicago Title Insurance Company, 2601 Riverside Avenue, Jacksonville, FL 32204.

    g.  Final Engineering Approval. The term "Final Engineering Approval" shall mean and refer to those approvals granted by the City, and other Governmental Authorities as required by law, of final engineering plans developed by Purchaser upon which final permits may be issued to allow for the construction of the Development of the Property for the Intended Use.

    h.  Final Plat Approval. The term "Final Plat Approval" shall mean and refer to that certain approval granted by the City of the Purchaser's proposed plat that subdivides the Property into Lots.

    i.  Governmental Authorities. The Term "Governmental Authorities" shall mean and refer to any governmental authority having jurisdiction over the Property in connection with the Development of

1

the Property for the Intended Use, including the City, County, State of Florida, any applicable Water Management District, Florida Department of Environmental Protection ("FDEP"), the State of Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, or the Army Corps of Engineers.

j.      Hazardous Material(s).  The term "Hazardous Material(s)" shall mean and refer to and include all hazardous, toxic, corrosive and radioactive materials, chemicals, fumes, gases, poisons, substances, refuse, trash, garbage or wastes; any pollutants or contaminates (including, without limitation, asbestos, polychlorinated bi-phenyls (PCBs), and raw materials which include hazardous, corrosive, toxic or radioactive components); or other similar substances or materials, whatsoever, which are included within the purview of or that are regulated by any Environmental Laws.

k.      Intended Use.  The term "Intended Use" shall mean the proposed single family, residential community to be developed by Purchaser on the Property , which community shall be comprised of a minimum of ▉▉▉▉▉▉ Lots upon which detached, single family dwellings shall be constructed by Purchaser.

l.      Land Use Approval.  The term "Land Use Approval" shall mean and refer to that certain approval granted by the City, and other Governmental Authorities as required by law, that amends the Future Land Use Map of the City's Comprehensive Plan to allow for the Development of the Property for the Intended Use, and which approval shall be subject to terms and conditions or limitations which are reasonably acceptable to Purchaser in its sole and absolute discretion. The Land Use Approval shall not be deemed final until all appeal periods related thereto have expired and any appeals filed have been finally determined favorably to Purchaser.

m.      Lot.  The term "Lot" shall mean and refer to each single family residential building lot hereafter approved by the City and other applicable Governmental Authorities for Development of the Property for the Intended Use.  Typical exterior dimensions of the Lots will be eighty feet (80') wide by one hundred forty feet (140') deep.

n.      Master Plan/Site Plan.  The term " Master Plan/Site Plan" shall mean and refer to the plans to be prepared by Purchaser in accordance with applicable laws, rules and regulations of the City and other Governmental Authorities upon which applications for building permits may be made to the City allowing for the Development of the Property for the Intended Use.

o.      Master Plan/Site Plan Approval.  The term "Master Plan/Site Plan Approval" shall mean and refer to that certain approval(s) granted by the City and other Governmental Authorities as required by law, of the Master Plan/Site Plan, which approval(s) shall be subject to terms, conditions or limitations which are reasonably acceptable to Purchaser in its sole and absolute discretion. The Master Plan/Site Plan Approval shall not be deemed final until all appeal periods related thereto have expired and any appeals filed have been finally determined favorably to Purchaser.

p.      Property.  The term "Property" shall mean and refer to the real property described on **Exhibit "A"** attached hereto and incorporated herein by this reference to be purchased by Purchaser pursuant to the terms of this Agreement, together with all improvements thereon and thereto, and all of the rights, privileges, appurtenances, hereditaments, easements, reversions, and remainders pertaining to or used in connection therewith, including, without limitation, all (i) development and concurrency rights and credits, impact fee credits, prepaid fees, air rights, water, water rights, water stock, water capacity, sewer, wastewater and reuse water rights, sewage treatment capacity, other utility capacity and rights, concurrency certificates, approvals, permits, and rights to receive reimbursement of prepaid utility expenses associated with the Development and the Lots, (ii) strips and gores, streets, alleys, easements, rights-of-way, public

2

ways, or other rights appurtenant, adjacent, or connected thereto, (iii) all minerals, oil, gas, and other hydrocarbon substances in, under, or that may be produced therefrom, (iv) all intangible property owned by Seller or used by Seller exclusively in connection with all or any portion of the Property, including, without limitation, all of Seller's right, title, and interest, if any, in and to: (1) all plats, improvement plans, drawings and specifications, and development rights and credits relating to the Property, (2) all books, records, reports, test results, environmental assessments, if any, as-built plans, specifications, and other similar documents and materials relating to the use, operation, maintenance, repair, construction, or fabrication of all or any portion of the Property; (3) all transferable business licenses, architectural, site, landscaping or other permits, applications, approvals, authorizations, and other entitlements affecting any portion of the Property; and (4) the benefits of all transferable guarantees, warranties, and utility contracts relating to all or any portion of the Property.

q.     Purchaser. The term "Purchaser" shall mean and refer to Toll Southeast LP Company, Inc., a Delaware corporation.

r.     Seller. The term "Seller" shall mean and refer to Boca Raton Executive Country Club Corp., a Florida corporation.

s.     Title Commitment. The Term "Title Commitment" shall mean and refer to the commitment for the issuance of owner's policies of title insurance as described in Section 7 of this Agreement.

t.     Utility Authority or Utility Authorities. The term "Utility Authority or Utility Authorities" shall mean any utility provider, whether publicly owned, privately owned or quasi-governmental utility authority, providing electrical, telephone, cable, natural gas, potable water, sanitary sewer, reuse water or other utilities required by the Governmental Authorities pursuant to applicable law for the Development of the Property for its Intended Use.

u.     Zoning Approval.  The term "Zoning Approval" shall mean and refer to that certain approval granted by the City that amends the City's Official Zoning Map to allow for the Development of the Property for the Intended Use (█ single-family homes on 80' x 140' lots), which approval shall be subject to terms and conditions or limitations which are reasonably acceptable to Purchaser in its sole and absolute discretion. The Zoning Approval shall not be deemed final until all appeal periods related thereto have expired and any appeals filed have been finally determined favorably to Purchaser.

2.     Purchase and Sale.  For the consideration herein expressed and upon the terms and conditions herein contained, Seller agrees to sell and Purchaser agrees to purchase the Property.

3.     Purchase Price.

a.     Amounts.  Purchaser shall pay at Closing a purchase price of █████████ ███████ (the "Purchase Price").

b.     Manner of Payment.  The Purchase Price for the Property, as adjusted by prorations and credits called for in this Agreement, shall be paid in cash at the Closing.

4.     Deposit.  In order to secure the performance by Purchaser in accordance with this Agreement, Purchaser shall deliver an initial deposit to Escrow Agent in the amount of ████████ ██████, on or before five (5) days from the Effective Date (together with all interest accrued thereon, the "Initial Deposit"). On or before five (5) days from the expiration of the Inspection Period, if Purchaser has not terminated this Agreement pursuant to Section 10 below, Purchaser shall deliver an additional deposit to Escrow Agent in the amount of ████████

3

████████████ together with all interest accrued thereon, (the "Additional Deposit"). The Initial Deposit and the Additional Deposit, together with all interest accrued thereon, to the extent paid by Purchaser, shall collectively be referred to herein as the "Deposit". Upon receipt of such funds, Escrow Agent shall deposit the Deposit in an interest bearing money market account.

The refundability of the Deposit to Purchaser shall be as follows (and time is of the essence with respect to these payments):

a.        Except (i) upon termination of this Agreement by Purchaser in the event Seller fails to cure any title defect; (ii) upon termination of this Agreement by Purchaser in the event of material default by Seller; or (iii) upon termination of this Agreement by Purchaser pursuant to Section 14 below, Twenty Five Thousand Dollars ($25,000.00) of the Initial Deposit shall be non-refundable to Purchaser upon the Effective Date and an additional Seventy-Five Thousand Dollars ($75,000.00) of the Initial Deposit shall be non-refundable to Purchaser within 15 days after the Effective Date; the parties agree that the non-refundable monies are to be used to pay taxes, maintenance, and other future expenses to carry the Property;

b.        Except as provided for in subsection g. below, One Hundred Twenty Five Thousand Dollars ($125,000.00) of the Deposit shall be non-refundable to Purchaser upon the expiration of the Inspection Period and Purchaser's delivery of the Additional Deposit to the Escrow Agent (provided Purchaser has not terminated this Agreement pursuant to Section 10 below);

c.        Except as provided for in subsection g. below, an additional One Hundred and Twenty Five Thousand and no/100 Dollars ($125,000.00) of the Deposit shall be non-refundable to Purchaser the date that is three (3) months after expiration of the Inspection Period (provided Purchaser has not terminated this Agreement prior thereto);

d.        Except as provided for in subsection g. below, an additional One Hundred and Twenty Five Thousand and no/100 Dollars ($125,000.00) of the Deposit shall be non-refundable to Purchaser the date that is six (6) months after expiration of the Inspection Period (provided Purchaser has not terminated this Agreement prior thereto);

e.        Except as provided for in subsection g. below, an additional One Hundred and Twenty Five Thousand and no/100 Dollars ($125,000.00) of the Deposit shall be non-refundable to Purchaser the date that is nine (9) months after expiration of the Inspection Period (provided Purchaser has not terminated this Agreement prior thereto);

f.        Except as provided for in subsection g. below, an additional One Hundred and Twenty Five Thousand and no/100 Dollars ($125,000.00) of the Deposit shall be non-refundable to Purchaser the date that is twelve (12) months after expiration of the Inspection Period (provided Purchaser has not terminated this Agreement prior thereto)

g.        The Deposit shall be returned to Purchaser upon occurrence of any of the following events: (i) upon termination of this Agreement by Purchaser in the event Seller fails to cure any title defect; (ii) upon termination of this Agreement by Purchaser in the event of material default by Seller; or (iii) upon termination of this Agreement by Purchaser pursuant to any other express right granted to Purchaser in this Agreement to terminate this Agreement and receive a refund of the Deposit, provided that the previous Deposit payments have not become nonrefundable under the Agreement.  In the event of default by Purchaser, then, as Seller's sole and exclusive remedy for Purchaser's default, Seller shall be entitled to receive the Deposit paid by Purchaser. The Deposit shall be applied against the Purchase Price at Closing.

4

5.　　　Closing. Provided that each of the Conditions Precedent described in Section 9 have been satisfied by Seller or waived by Purchaser, the Closing of the purchase and sale of the Property shall occur on the date (the "Closing Date") that is the earlier of (i) fifteen (15) days after the Required Approvals have become final, or  (ii) the date that is fifteen (15) months after expiration of the Inspection Period (the "Outside Closing Date"). In the event the Required Approvals have not been obtained by the Outside Closing Date, then the Outside Closing Date may be extended by Purchaser for up to two (2) periods of ninety (90) days each upon written notice (each, an "Extension Notice") delivered to Seller and the Escrow Agent on or before the then Outside Closing Date, which Extension Notice to the Escrow Agent shall include an immediate payment in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for each such extension exercised by Purchaser. The definition of "Outside Date" shall be automatically extended for six (6) months for all purposes under this Agreement upon the timely issuance of an Extension Notice and the applicable Extension Payment. Extension Payments, when delivered by Purchaser to the Escrow Agent, shall not be applicable to the Purchase Price at Closing and shall not be refundable to Purchaser except (i) upon termination of this Agreement by Purchaser in the event Seller fails to cure any title defect; (ii) upon termination of this Agreement by Purchaser in the event of material default by Seller; or (iii) upon termination of this Agreement by Purchaser pursuant to Section 14 below.

6.　　　Place of Closing. Closing shall occur in the offices of the Closing Agent. Notwithstanding the foregoing, the parties agree to use good faith, reasonable efforts to conduct the Closing as a "mail-away" Closing, without the need for personal appearance at Closing by representatives of either party.

7.　　　Title and Survey.

　　　a.　　　Title Commitment.　　On or before twenty (20) days after the Effective Date (the "Title Commitment Deadline"), Seller shall deliver to Purchaser through the Title Agent, a Title Insurance Commitment as to the Property ("Title Commitment") issued by a national title insurance company reasonably acceptable to Buyer (the "Title Company") and committing to issue to Purchaser the Policy (as that term is defined in Subsection 7.b. below) in the amount of the Purchase Price upon the recording of the Deed to Purchaser. Title to the Property as reflected by the Title Commitment and the Policy issued pursuant thereto shall be subject only to encumbrances and matters which are acceptable to Purchaser as not adversely affecting the ability of, and cost to, Purchaser of utilizing the Property, as well as the financing and sale of same, which determination of adversity and cost shall be at Purchaser's sole discretion ("Permitted Encumbrances"). The Title Commitment shall include legible copies of all documents referenced therein and shall agree to insure any easements benefiting the Property. The Title Commitment shall provide that all "standard exceptions" (including standard exceptions for taxes and assessments not shown in the public records, claims of unrecorded easements, parties other than owner in possession, mechanic's liens and matters disclosed on accurate survey, but excluding current real estate taxes) shall be deleted from the Policy when issued. Seller shall provide to the Title Company any affidavits, undertakings and other instruments required to delete said standard exceptions. Purchaser shall have thirty (30) days from receipt of the Title Commitment in proper form within which to review the same. In the event Purchaser finds the Title Commitment to contain any matter, requirement or exception other than a Permitted Encumbrance (a "Title Defect"), Purchaser may give written notice to Seller of Purchaser's objection(s) within, and only within, the period for review of the Title Commitment (the "Title Defect Notice"). Within ten (10) days after receipt of said notice from Purchaser, Seller shall elect whether or not it shall cure the Title Defects raised by Purchaser. Failure of Seller to give notice to Purchaser within said ten (10) day period will be deemed Seller's election to cure. In such event, or if Seller elects to cure, then Seller shall thereupon promptly use diligent, good faith best efforts to cure said Title Defect(s) (including payment of monies and the institution and diligent pursuit of any legal actions) within one hundred twenty (120) days after Purchaser's notice of objection(s) is received by Seller. If Seller either timely elects to not cure the Title Defects or is unable to cure all Title Defects within said period, Seller shall give prompt written notice to Purchaser of those Title Defects which Seller is unable to cure, whereupon Purchaser shall

5

have the option either to (a) waive the remaining Title Defects and proceed to Closing, (b) provide Seller with additional time to cure the Title Defect(s), the duration of which must be agreed upon in writing, or (c) terminate this Agreement and receive a refund of the Deposit (less the Initial Deposit) and all Extension Payments, if any, whereupon the parties shall thereafter be relieved of all further liability hereunder.

If any Closing is scheduled to occur more than thirty (30) days from the date of the Title Commitment, the Title Commitment shall be updated by endorsement ("Update Endorsement") which endorsement, together with legible copies of any additional matters identified therein, shall be delivered to Purchaser no less than five (5) business days before the respective Closing Date.

If any Update Endorsement discloses any new requirement, defect, encumbrance or other adverse matter that is not a Permitted Encumbrance, then Purchaser shall notify Seller in writing specifying the new Title Defect. Seller shall have a period of sixty (60) days following the receipt of such notice from Purchaser to cure such new Title Defect and, if necessary, the respective Closing Date shall be extended accordingly. Seller agrees to use diligent, good faith best efforts to attempt to remove the new Title Defect, as provided above. If Seller fails to cure any such new Title Defect Purchaser shall have the remedies provided above in this Section 7.a. unless the new Title Defect was caused by Seller or recorded by Seller, then in such event Seller will be in default under the Agreement and Purchaser shall have all rights as provided for in Section 18.

      b.      Title Policy. At Closing, Seller shall furnish to Purchaser, at Seller's expense, a standard ALTA Owner's Policy of Title Insurance 7-1-21 (with Florida modifications) for the Property based on the Title Commitment and any issued Update Endorsements (the "Policy"). The Policy will be issued by the Closing Agent and be underwritten by the Title Company, will be in the amount of the Purchase Price, and will insure Purchaser's fee simple title to the Property subject only to the Permitted Encumbrances and, if Purchaser does not obtain the Updated Survey described in Subsection 7.c. below, subject to ALTA standard exceptions for matters which would be disclosed by an accurate survey and inspection of the Property, and easements and claims of easements not shown by the public records.

      c.      Survey. Within sixty (60) calendar days after the Effective Date, Purchaser shall obtain a boundary survey of the Property at Purchaser's expense (the "Survey"). In the event the Survey reflects any easements, encroachments, rights-of-way, roads, lack of access, deficiencies, gaps or gores or hiatus between any of the parcels included within the Property or between the Property and any adjoining streets or roads, or any other adverse matters not acceptable to Purchaser, Purchaser shall notify Seller of Purchaser's objections to the Survey on or before the later of (a) twenty (20) days after receipt of the Survey, or (b) the deadline for objecting to the Title Commitment. Objections to the Survey shall be treated as Title Defects pursuant to Section 7.a. above. Purchaser shall have the option of utilizing the legal description on the Survey for the description of the Property to be included in the Title Policy and Deed, if different than the vesting deed legal and if approved by the Title Company. Purchaser shall be entitled to obtain an update of the Survey ("Updated Survey") at any time prior to the Closing, at Seller's expense. If any Updated Survey reveals any adverse matter not disclosed by the Survey, then such Updated Survey defect shall be handled in the same manner as a new Title Defect under Subsection 7.a. above.

8.      Required Approvals. Purchaser shall be making application to various Governmental Authorities, for the development of the Property for the Intended Use which shall include but shall not limited to the following approvals, which shall be referred to collectively as the "Required Approvals":

      i.      Concurrency Approvals;

      ii.      Zoning Approval;

iii.     Master Plan/Site Plan Approval;

iv.     Land Use Approval;

v.     Final Engineering Approval;

vi.     Final Plat Approval; and

vii.     Receipt by Purchaser of all other permits, approvals, easements, licenses and other agreements as may be imposed or required by any Governmental Authority pursuant to applicable law to permit the lawful construction, installation, maintenance and operation of the Development of the Property for the Intended Use such that upon (A) Purchaser's compliance with the ordinary application process and (B) Purchaser's posting of requisite financial security, site improvements can be commenced by Purchaser and there will be no additional conditions to issuance of building permits for each of the Lots.

viii.     Prior to obtaining Final Engineering Approval, Purchaser shall have obtained written evidence, acceptable to Purchaser, in its sole and absolute discretion, that all utility services necessary for the Development of the Property for the Intended Use (e.g., water, sewer, electricity, telephone, cable television, and if available to the Property, gas), are available to the Property line with sufficient capacity and adequacy to service the Property and there is no pending moratorium on the immediate availability of said utilities.  Purchaser shall have obtained written evidence from the Utility Authority which provides potable water service that the Utility Authority has sufficient capacity to meet the fire flow pressure requirements of the Governmental Authorities. If Purchaser is required to extend water and sewer lines to the Property, the extension of said lines can be accomplished within the public right of way or existing utility easements and will not require crossing any private property or the acquisition and/or dedication of additional right-of-way.

Purchaser shall submit all applications to Seller for Seller's review and approval, which approval shall not be unreasonably conditioned or delayed.  Seller shall review any applications within five (5) days of receipt and once approved shall execute all owner consents and applications as required.  The Required Approvals shall be deemed to be in place when such approvals and all applicable appeal periods related thereto have expired and any appeals filed have been finally determined favorably to Purchaser.  Purchaser shall not be obligated to accept any conditions or requirements imposed within the Required Approvals which Purchaser deems to be unreasonably or unduly costly to Purchaser in the development of the Property.

9.     Conditions to Closing.  The obligation of Purchaser to purchase the Property pursuant to this Agreement is contingent upon the satisfaction of each and every one of the following contingencies (collectively, the "Conditions Precedent") on or before the Closing Date.

a.     Seller's Representations and Warranties.  That as of the Effective Date and at the time of Closing all representations and warranties of Seller, including but not limited to the representations and warranties made in this Agreement shall be true, accurate and complete to the best of Seller's knowledge, and shall not be misleading in any material respect and there shall have been no breach or breaches of the same by Seller.

b.     Seller Covenants and Agreements.  Seller has fully complied with all of Seller's obligations, covenants and agreements as set forth in this Agreement.

c.     Condition of Property.  The environmental and physical condition of the Property on the date of Closing Date shall not be materially different from the environmental and physical condition existing as of the date of the expiration of the Inspection Period.

7

     d.      Condition of Title. Title shall be in the condition as required under Section 7 of this Agreement.

     e.      Required Approvals. Buyer shall have received all Required Approvals.

     f.      Dock Encroachments. That the two (2) wooden dock structures that are adjacent to the properties located at 7498 Fairway Trail (PCN 06434632400110480) and 7464 Fairway Trail (PCN 06434632400110490) and which currently encroach upon the Property (the "Dock Encroachments") have been (1) removed by Seller or the owner of the applicable encroaching property (a "Neighbor"), or (2) Seller has obtained an agreement from each Neighbor in form and substance acceptable to Purchaser, which acceptance shall not be unreasonably withheld, pursuant to which each Neighbor acknowledges the encroachment and allows Purchaser to remove the structures in the ordinary course of Purchaser's development of the Property. Seller shall use reasonable efforts to cause the foregoing condition to be satisfied at Seller's expense (if any), however if Seller proceeds under option (2) above, then Seller shall record the agreement against each Neighbor's property in the Public Records of Palm Beach County, and Purchaser shall thereafter be responsible for the costs of removing the structures.

     g.      Moratorium. There shall be no general moratorium imposed or announced by any governmental or quasi-governmental authority ("Authority") that would result in any Authority denying permits necessary for the construction, use or occupancy of each Lot for a single-family dwelling

If one or more of the foregoing Conditions Precedent is not satisfied on or before the Closing Date, then at any time thereafter in Purchaser's sole discretion Purchaser may terminate this Agreement by written notice ("Termination Notice") to Seller and, upon the giving of such Termination Notice, the refundable portion of the Deposit (in accordance with Section 4) shall be refunded to Purchaser, this Agreement shall terminate and Purchaser shall have no further obligations hereunder with the exception of providing to Seller, within seven (7) calendar days of the date of the Termination Notice, and to the extent not previously delivered to Seller, electronic files and hard copies of all documentation submitted to any Governmental Authority in connection with Purchaser's efforts to obtain the Required Approvals (including application forms, plans, studies, reports, correspondences, and other documentation). .

10.     Inspection Period. Within five (5) days after the Effective Date, Seller shall deliver to Purchaser copies of all title reports and policies, surveys, environmental reports, engineering reports and studies, plans, specifications, reports, studies and other such items related to the Property that are in Seller's current possession or control. Purchaser and its agents may enter upon the Property at all times prior to the Closing Date to perform reasonable inspections, tests and studies. Purchaser shall restore the Property to its prior condition after such entry(s), and shall indemnify and hold harmless Seller with respect to any claims, liabilities or expenses of Seller arising from physical damage or injury to persons or property directly resulting from Purchaser's inspection activities on the Property. Such obligations of Purchaser shall survive the Closing or termination of this Agreement. The foregoing repair, indemnity and defense obligations do not apply to (a) any loss, liability cost or expense to the extent arising from or related to the acts or omissions of Seller, or its agents or consultants, (b) any diminution in value in the Property arising from or relating to matters discovered (and not caused) by Purchaser during its investigation of the Property, (c) any latent defects in the Property discovered (and not caused) by Purchaser, or (d) the release or spread of any Hazardous Substances which are discovered (but not deposited) on or under the Property by Purchaser.

Notwithstanding any other provision herein to the contrary, in the event that for any reason in its sole discretion Purchaser determines that the Property is not suitable for Purchaser's Intended Use, Purchaser may, by notice to Seller given within one hundred (100) days after the Effective Date (the "Inspection Period"), terminate this Agreement. In the event of such termination the Deposit shall be fully refunded to

Purchaser in accordance with Section 4 herein and the parties shall be released from all further obligations hereunder.

11.     Applications for Concurrency Approvals and City Council Approvals.  On or before seveny-five (75) days after the expiration of the Inspection Period, Purchaser shall submit complete applications, along with all required application fees, to the City and County for the Concurrency Approval and City Council Approvals.  The applications shall name the Seller as a co-applicant on all applications and the Seller shall execute any letters of authorization or application forms that are required for the application submissions. Within  seven (7) calendar days of the submittal of the initial application(s), and within seven (7) calendar of each subsequent application submittal, the Purchaser shall provide the Seller with electronic files and hard copies of any documentation submitted to any Governmental Authority in connection with the submittal (including all application forms, plans, studies, reports, correspondences, and other documentation).

12.     Closing Procedures.  At Closing:

a.     Seller shall execute and deliver to Purchaser (i) a duly executed and acknowledged general special warranty deed conveying the Property to Purchaser (the "Deed"), (ii) a duly executed assignment of water, sewer, transportation, school and all other impact fee credits or reservations associated with the Property; (iii) the Policy required herein, (iv) a general warranty assignment of all of the permits and approvals and all other rights or interests of Seller in or related to the Property; and (v) such further instruments as may be required by the Title Company to vest in Purchaser title to the Property.  The Deed will convey fee simple marketable title to the Property, free of all mortgages and liens whatsoever and free of all encumbrances and other matters except for the Permitted Encumbrances.

b.     Purchaser shall pay the Purchase Price to Seller.

c.     General real estate taxes shall be prorated as of Closing Date based on application of the preceding year's rates to the latest assessed valuation or statements issued to Seller for the current year's taxes, if available.  If the real estate taxes for the year covered by the apportionment are later determined to be higher or lower than those that are apportioned, adjustment shall be made directly between Seller and Purchaser upon the request of either.

d.     Seller shall pay all special assessments and taxes, interest and penalties levied against the Property prior to Closing.

e.     Seller shall execute and deliver to Purchaser in accordance with Section 1445 of the Internal Revenue Code and regulations promulgated thereunder, an affidavit by Seller signed by an officer of the corporation authorized to give such assurance stating, under penalty of perjury, Seller's United States taxpayer identification number and that Seller is not a foreign person as defined by I.R.C. 1445 (f) (3).  In the event that Seller shall be unable to provide such affidavit at Closing, Purchaser shall deduct and withhold fifteen percent (15%) of the amount realized by Seller on the sale of the Property as required by I.R.C. 1445, and remit same to the Department of Treasury.

f.     Complete and sole possession of the Property will be delivered to Purchaser at the Closing.

g.     Seller shall pay for all documentary stamps and transfer taxes for the Deed to Purchaser, documentary stamps, transfer taxes and cost to record any title curative instruments; the premium for the Policy, Seller's own attorneys' fees, and any other expense allocated to Seller by this Agreement.  Purchaser shall pay Purchaser's own attorneys' fees, the recording charges for the Deed to Purchaser, and any other expense allocated to Purchaser by this Agreement.

h.      The parties shall execute and deliver a closing statement setting forth the purchase price calculation for all credits, adjustments and prorations between Purchaser and Seller required by this Agreement, the net proceeds due Seller, and the net cash due from Purchaser.

i.      Seller shall execute and deliver an affidavit on behalf of Seller attesting to the absence of any claim or suit (threatened or pending), judgment outstanding against Seller, pending or anticipated bankruptcy or reorganization, pending or anticipated assessments, financing statement, claim of lien or potential lienors known to Seller, persons other than Seller in possession of the Property, and further attesting as to whether there have been any improvements to the Property made by or on behalf of anyone other than Purchaser during the ninety (90) day period preceding Closing.  If any such labor or materials have been provided within said period, Seller shall deliver such affidavits, releases and waivers of lien rights from such persons as shall be required by Title Company so as to insure against potential liens or claims.

j.      The parties shall execute and deliver any other documents required by this Agreement or reasonably necessary in order to close this transaction.

k.      The parties shall each execute and deliver to the other organizational documents, evidence of good standing, and certificates, resolutions, actions and consents required to establish the authority of the officers executing the documents to complete this transaction.

l.      Seller shall assign to Purchaser all of Seller's development rights with respect to the Property, including, without limitation, all zoning density and other rights under any permits or approvals granted by any Governmental Authority, all pursuant to an assignment and assumption instrument reasonably acceptable to both parties ("Assignment of Permits")

13.     Seller's Covenants, Representations and Warranties.  Seller makes the following covenants, representations and warranties below, which shall be true and correct as of the Effective Date and on *the* Closing Date:

a.      Representations and Warranties:

i.      Seller has good, marketable and indefeasible fee simple title to the Property, and at Closing Seller shall convey to Purchaser good, marketable and indefeasible fee simple title to the Property, free and clear of all liens, defects, encumbrances, conditions, exceptions, restrictions or other matters affecting title except the Permitted Encumbrances and the Dock Encroachments described in paragraph 9(f), above which shall be removed in accordance with said paragraph.

ii.      There is no litigation or proceeding pending or threatened against or relating to any of the Property, and no pending, or, to the knowledge of Seller, threatened or contemplated condemnation actions or special assessments of any nature with respect to the Development, except for the Dock Encroachments described in paragraph 9(f), above which shall be removed in accordance with said paragraph.

iii.      Seller is duly organized, existing and in good standing under the laws of the State of Florida, and is duly qualified to transact business in the State of Florida.  Seller has not filed, voluntarily or involuntarily, for bankruptcy relief within the last six (6) months under the laws of the United States Bankruptcy Code, nor has any petition for bankruptcy or receivership been filed against Seller within the last six (6) months.  Seller is not insolvent.  Seller is, and at Closing will be, authorized and permitted to enter into this Agreement and to perform all covenants to be performed by Seller hereunder, and Seller's

10

right to execute this Agreement is not limited. The individual executing this Agreement on behalf of Seller has all necessary power and authority to so execute this Agreement and to bind Seller to the terms hereof.

iv.     The Property has fully dedicated public access to and from public highways, roads, and rights-of-way, and Seller has no knowledge of any fact or condition which would result in the termination of the current access to or from the Property to any presently existing highways, roads, and rights-of-way on or adjoining the Property.

v.     Seller has no knowledge of any pending or contemplated change in any zoning or other regulation or private restriction, any pending or threatened judicial or administrative action, or any action pending or threatened by any third parties applicable to the Property with the exception of the Dock Encroachments described in paragraph 9(f), above which shall be removed in accordance with said paragraph.

vi.     Except for debts, liabilities, and obligations for which provision is made herein for proration or other adjustment at Closing, all liabilities and obligations arising from the ownership and operation of the Property will be paid on or before Closing.  Seller does not have a mortgage or other indebtedness on the Property.

vii.     There are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings under the Bankruptcy Code, 11 U.S.C. §101, et seq., or under any other debtor relief laws contemplated by or pending or threatened against Seller or any part of the Property.

viii.     With the exception of the Dock Encroachments described in paragraph 9(f), (which shall be removed in accordance with said paragraph), there are no parties in possession of any portion of the Property as lessees, licensees, tenants at sufferance, or trespassers.  No person, firm, corporation, or other entity has or at any Closing shall have any right or option to acquire all or any portion of the Property.

ix.     Subject to receipt of the City Council Approvals, the Development of the Property for its Intended Use is in compliance with all applicable laws, ordinances, regulations, statutes, rules, and restrictive covenants or deed restrictions relating thereto.

x.     Execution and delivery of this Agreement, consummation of the transaction described herein, and compliance with the terms of this Agreement will not conflict with, or constitute a default under, any agreement to which Seller is a party or by which Seller or the Property are bound, or violate any regulation, law, court order, judgment, or decree applicable to Seller or the Property.

xi.     Seller has no knowledge of any archaeological, anthropological, or historical finds, objects, or sites or any endangered or threatened species in, on, or about the Property.  To the best of Seller's knowledge, no portion of the Property constitutes a "critical habitat" as such term is defined in the Endangered Species Act of 1973, as amended.

xii.     To the best of Seller's knowledge, no part of the Property has been used as a land fill or a dump for garbage or refuse or for the storage or disposal of any hazardous or toxic materials, and no part of the Property contains any materials, whether brought to the Property, deposited thereon, used on the Property, generated on the Property as a product or by-product of activities on the Property, or otherwise: (i) that are or contain polychlorinated bi-phenyls (PCBs) or asbestos; (ii) that are wastes or other regulated substances under the Resource Conservation and Recovery Act and/or the regulations promulgated or adopted thereunder; (iii) that are hazardous substances or other regulated substances as defined in the Comprehensive Environmental Response, Compensation and Liability Act, as amended (or regulations promulgated, adopted or incorporated thereunder); or (iv) that are otherwise classified as

11

hazardous or regulated substances under any federal or applicable state law or regulation. There are no underground or aboveground storage tanks on the Property and, to Seller's knowledge, there never have been any underground or aboveground storage tanks on the Property, with the exception of one (1) above-ground storage tank adjacent to the driving range which has since been removed. Without limiting in any respect the generality of the foregoing, there are no actual, alleged or perceived health issues applicable to any portion of the Property. The copies of any environmental report that may have been delivered by Seller to Purchaser, are complete and accurate copies of the same and Seller has no other environmental reports, tests or audits in its possession or under their control, and Seller has no knowledge of any other environmental reports, tests or audits regarding any portion of the Property existing elsewhere.

xiii.    To the best of Seller's knowledge, there are no surface faults, ground settling soil or subsoil conditions or similar problems from any cause on or in the vicinity of the Property which would restrict, impair or prohibit use of the Property for a residential development, or increase or affect the cost of development of a residential community on the Property.

xiv.    The Property is entirely above the applicable one hundred (100) year flood elevation and no portion of the Property is within a flood plain or special flood hazard area as indicated by any map or plat issued or controlled by the Federal Insurance Administration, the Federal Emergency Management Association, and/or any other federal, state or local agency, which will result in a requirement for flood insurance from the Federal Insurance Administration.

xv.    Seller has no knowledge of any adverse fact relating to the physical condition of the Property for residential construction purposes that is not readily observable or has not been specifically disclosed in writing to Purchaser, including without limitation land fills, hazardous wastes, sink holes, fault lines, other geological conditions, or adverse soil conditions.

xvi.    With the exception of the Greater Boca Raton Beach and Park District, neither the Property nor any part thereof is within a special taxing district or community development district, nor has any application been made or submitted for the creation thereof or annexation thereby.

xvii.    No commitments have been made to any governmental authority, school board, church or other religious body, or any other organization, group or individual relating to the Property which would impose an obligation upon Purchaser or its successors or assigns to make any contributions or dedications of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Property.

xviii.    No governmental authority has imposed any requirement that would bind Purchaser to pay directly or indirectly any special fees or contributions or incur any unusual expense or obligation in connection with Purchaser's residential construction on any Lot, except for customary building permit and inspection fees related to the issuance of building permits, impact fees, park fees and utility connection fees and deposits.

xix.    There is no pending, threatened or contemplated condemnation or similar proceeding affecting the Property or any portion thereof.

xx.    Seller covenants and agrees to fulfill each of its obligations set forth in this Agreement.

xxi.    Seller shall not grant or convey any easement, lease, license, or permit in or to the Property or otherwise encumber, create or allow any new title matter after the Effective Date of the Title Commitment, except with Purchaser's approval in regard to the Permits and Approvals.

12

xxii.   To the best of Seller's knowledge, the Property is not included within, or encumbered by, any restrictions or assessment declarations of any homeowner' or property owners' association.

xxiii.   From and after the Effective Date, Seller shall refrain from committing any waste or nuisance upon the Property and Seller will maintain and keep the Property in its current condition except for the acts of Seller and Purchaser in connection with Purchaser's inspection of the Property. Seller acknowledges that the natural amenities of the Property are a material  inducement to Purchaser entering into this Agreement, and Seller agrees not to alter or impact any of such natural amenities, including, without limitation, removing any dirt, fill or trees from the Property.

xxiv.   Seller shall promptly advise Purchaser of any material notices actually received by Seller from governing authorities having jurisdiction over the Property during the pendency of this Agreement.

xxv.   While this Agreement is in effect, the Seller shall not convey or encumber any interest in the Property, or permit or authorize any such conveyance or encumbrance, without the Purchaser's advance written consent in each instance, unless each such conveyance or encumbrance, as the case may be, in all respects is expressly subject, subordinate, and inferior in all respects to the Purchaser's rights under this Agreement.

All of the representations and warranties made herein are true, correct and complete as of the date hereof and all information supplied to or to be supplied by Seller or its agents, shall be supplemented or corrected as necessary so as to be true, correct, and complete in all material respect at Closing, as amended.

b.   Covenants of Seller. Seller covenants and agrees with Purchaser as follows:

i.   Seller shall not enter into any contract, agreement, writing or instrument that will affect the marketability of title to any part of the Property subsequent to the Effective Date.

ii.   Seller shall promptly advise Purchaser in writing of and deliver copies to Purchaser of any notices concerning the Property that Seller receives from any appraisal districts, taxing authorities, or any city, county, or other governmental authority, agency, department, division or instrumentality having jurisdiction over the Property, and of any litigation, arbitration, or administrative hearing concerning the Property.

iii.   In the event that any material changes occur as to any information, documents, exhibits, or otherwise making any of the foregoing representations and warranties untrue or inaccurate during the term hereof or as of the date of Closing, or in any other part of this Agreement, of which Seller has actual knowledge or for which Seller becomes aware during the term hereof, then Seller shall immediately disclose same to Purchaser when first available to Seller; and in the event of any such change which is materially adverse to Purchaser's ability or cost to construct, market, finance or sell homes within the Development, in Purchaser's sole and absolute discretion. Purchaser shall notify Seller in writing and in the event Seller fails or refuses to remedy or cure such event so as to cause the representation or warranty to be true as of the date of Closing, then Purchaser may, at its election, and as its sole alternative remedies, waive such condition and Purchase the Property, or terminate this Agreement and obtain a refund of the Deposit made hereunder whereupon the parties shall have no further obligation except for those which expressly survive termination hereunder. Notwithstanding the foregoing, if any such change occurred as a result of the affirmative act of Seller, the same shall constitute a default under this Agreement, entitling Purchaser to exercise any and all rights and remedies allowed in law and equity.

13

iv.      While this Agreement is in effect, the Seller shall not convey or encumber any interest in the Property, or permit or authorize any such conveyance or encumbrance, without the Purchaser's advance written consent in each instance, unless each such conveyance or encumbrance, as the case may be, in all respects is expressly subject, subordinate, and inferior in all respects to the Purchaser's rights under this Agreement.

Each of the covenants, warranties and representations contained in section 11 and 12 and other sections of this Agreement shall be deemed made as of the Effective Date and again as of the date of Closing, and shall not merge into the Deed at Closing but shall survive Closing.  Seller's covenants, representations and warranties set forth in Section 11 and 12 shall be continuing for a period of twelve (12) months following the Closing Date, and are deemed to be material to Purchaser's execution of this Agreement and Purchaser's performance of its obligations hereunder but only to the extent that such covenants, representations, and warranties materially affect the Development of the Property for its Intended Use.  Notwithstanding anything in this Agreement to the contrary, Seller does and shall indemnify, defend, save and hold harmless Purchaser from and against any and all causes of action, losses, claims, damages, liabilities, and all costs and expenses, attorney fees and court costs, fees and costs, and all other expenses related to, growing out of, or arising from any breach of any representation, covenant or warranty of Seller as set forth above.

14.     Condemnation.  In the event that prior to Closing, all or any portion of the Property or any rights or easements therein shall be taken by condemnation or rights of eminent domain or like process, or shall be threatened therewith, and the same, in Purchaser's reasonable opinion would have a materially adverse impact upon Purchaser's proposed development of the Property, Purchaser shall at its sole discretion, elect in writing to either:  (a) continue this Agreement in full force and effect, notwithstanding such taking or threatened taking, in which case Purchaser shall be required to continue the purchase of the Property and shall be entitled to receive at Closing an assignment of Seller's interest in the condemnation action related to the Property and the proceeds of the taking; (b) delete from this Agreement the portion of the Property condemned or threatened to be condemned, with a reduction in the Purchase Price based upon the number of Lots taken or condemned; or (c) terminate this Agreement and receive a full refund of the Deposit. Failure of Purchaser to make a written election as aforesaid prior to the Closing Date shall constitute an election to terminate this Agreement and the Deposit and all interest accrued thereon shall be returned to Purchaser.

15.     Real Estate Commission.  Purchaser and Seller each represent and warrant to the other that no broker, agent or finder, licensed or otherwise, has been engaged by it, respectively, in connection with the transaction contemplated by this Agreement.  In the event of any claim for a broker's, agent's or finder's fee or commission in connection with the negotiation, execution or consummation of this transaction, the party upon whose statement, representation or agreement any such actual liability arises shall indemnify, hold harmless and defend the other party from and against such claim and liability, including, without limitation, reasonable attorneys' and paralegals' fees and court costs.

16.     Assignment.  This Agreement may be assigned by Purchaser without Seller's consent to either: (A) an affiliate of Purchaser and/or (B) a person or entity providing off balance sheet financing to Purchaser in a so-called "land banking transaction" whether or not such party is an affiliate of Purchaser.  Except as set forth in the preceding sentence, this Agreement may not be assigned by Purchaser without Seller's consent, which shall be provided or withheld in Seller's reasonable discretion.   Purchaser agrees that Purchaser shall continue to be primarily responsible and jointly and severally liable for non-performance or breach by any assignee of this Agreement, notwithstanding any such assignment and assumption.  Any assignment in violation of this paragraph is void unless consented to in writing by Seller.  Delivery of a deed at Closing shall be deemed to be consent to an assignment to the grantee named in such deed.

14

17.     Survival. The representations, warranties, covenants, agreements and indemnities set forth in this Agreement shall remain operative and shall survive Closing and the execution and delivery of the Deed, and shall not be merged therein.

18.     Seller's Material Default. If Seller fails to fully and timely perform any of its obligations hereunder not due to Purchaser's default and such failure continues for thirty (30) days following notice thereof in writing from Purchaser, then Purchaser may, at its option: (a) terminate this Agreement by further written notice to Seller, in which event the Deposit shall be refunded to Purchaser in accordance with Section 4 herein, Seller shall reimburse Purchaser for its actual, verifiable out-of-pocket costs incurred in connection with this Agreement not to exceed Three Hundred Thousand Dollars ($300,000.00) and, following such refund, the parties shall have no further liability under this Agreement; (b) grant, from time to time, such extensions of time as Purchaser deems proper under the circumstances without thereby waiving any other remedy permitted in this Agreement; or (c) seek specific performance of Seller's obligations under this Agreement.   In the event Purchaser elects to terminate this Agreement because Seller breaches this Agreement by conveying all or a portion of the Property to a third party and specific performance is not an available or adequate remedy, then the Purchaser shall be entitled to recover monetary damages from Seller as a result of such default; provided, however, that said monetary damages shall be calculated as the difference between the purchase price under this Agreement and the purchase price in connection with the sale to a third party.

19.     Purchaser's Default. If Purchaser fails to fully and timely perform any of its obligations hereunder not due to Seller's default or the failure of any condition to such obligation  and such failure continues for thirty (30) days following notice thereof in writing from Seller, then Seller may, at its option and as Seller's sole and exclusive remedy for Purchaser's default terminate this Agreement by further written notice to Purchaser, in which event Seller may receive and retain any Deposit amounts and Extension Payments that have actually been paid by Purchaser or provided to the escrow agent at the time of Purchaser's default, and the parties shall have no further liability under this Agreement. Seller hereby waives all other remedies, including without limitation any other claim for monetary damages and the right to enforce specific performance of this Agreement.  Purchaser and Seller acknowledge and agree that it would be difficult or impossible to ascertain the actual damages suffered by Seller as a result of any breach or default by Purchaser hereunder and agree that such liquidated damages are a reasonable estimate of such damages. Seller further acknowledges and agrees that Purchaser was materially induced to enter into this Agreement in reliance upon Seller's agreement to accept such Deposit and any Extension Payments as Seller's sole and exclusive remedy and that Purchaser would not have entered into this Agreement but for Seller's agreement to so limit Seller's remedies as provided herein.

20.     Miscellaneous.

        a.      Notice. Regardless of whether such is expressly specified herein, any notice to be given or served upon any party hereto in connection with this Agreement must be in writing, and will be deemed delivered, whether or not actually received, when delivered by hand delivery, when deposited in the United States Mail, postage prepaid, registered or certified mail, return receipt requested, when sent by electronic mail or when delivered to a national courier service such as Federal Express for delivery not later than the next business day, and addressed to Seller or Purchaser, as the case may be, or such party's agent or representative, at the following addresses, or to such other address or such other person as the addressee party shall have last designated by notice to the other party pursuant to the provisions of this Agreement:

|                      |                                                     |
|----------------------|-----------------------------------------------------|
| If to Seller:        | Kotler Realty<br>Attn: Rae Kotler<br>7191 NW 3rd Avenue<br>Boca Raton, Florida 33487<br>Telephone: 561-866-9965<br>Email:bluerae3@me.com |
| With a copy to:      | The Kleppin Firm, P.A.<br>Attn: Chris Kleppin & Allyson Morgado<br>8751 W. Broward Blvd.<br>Suite 105<br>Plantation, Florida 33324<br>Telephone: (954) 424-7022<br>Email:chris@kleppinlaw.com |
| If to Purchaser:     | Toll Southeast LP Company, Inc.<br>c/o Toll Bros., Inc.<br>Attn: Tom Murray, Regional President<br>2555 SW Grapevine Parkway, Suite 100<br>Grapevine, TX 76051<br>Telephone: (817) 329-7961<br>Email: tmurray@tollbrothers.com |
| with copies to:      | Toll Southeast LP Company, Inc.<br>c/o Toll Bros., Inc.<br>Attn: Alex Martin, Group President<br>951 Broken Sound Pkwy. NW, Suite 180<br>Boca Raton, FL 33487<br>Phone: (561) 999-1877<br>E-mail: amartin@tollbrothers.com |
| and                  | Toll Southeast LP Company, Inc.<br>c/o Toll Bros., Inc.<br>Attn: Thomas J. Smith, III, VP & Counsel<br>1140 Virginia Drive<br>Fort Washington, PA 19034<br>Phone: (215) 293-4366<br>E-mail: tsmith@tollbrothers.com and<br>    legalnotices@tollbrothers.com |
| If to Escrow Agent:  | Chicago Title Insurance Company<br>601 Riverside Avenue<br>Jacksonville, FL 32204<br>Attn: _____<br>Telephone: (888) 934-3354<br>E-mail: _____ |

16

b.  Entire Agreement; Amendments.  This Agreement embodies the entire agreement between the parties and cannot be amended except by written agreement signed by the parties.

c.  Attorney's Fees.  If any legal action is commenced by any party to enforce or interpret any provision of this Agreement, the party which does not prevail shall pay to the prevailing party all costs and expenses of suit, including without limitation attorney, paralegal and expert fees, incurred by the prevailing party in all judicial and administrative proceedings and at all levels of such proceedings.

d.  Dates and Time.  If the final day of any period or the deadline for performance of any obligation under this Agreement falls on a Saturday, Sunday or legal holiday, then the final day of the period or the deadline for performance shall be deemed to fall on the next day which is not a Saturday, Sunday or legal holiday.  Notwithstanding anything herein to the contrary, if the Closing Date should fall within the last two (2) weeks of any of Purchaser's fiscal quarters (i.e. the last two (2) weeks of January, April, July and October), then Purchaser shall have the right to extend the date of Closing to the first week of the next fiscal quarter.  Any reference in this Agreement to any time period of less than six (6) days shall, in the computation thereof, exclude Saturdays, Sundays and legal holidays.

e.  Governing Law and Venue.  The laws of the State of Florida shall govern the validity, enforcement and interpretation of this Agreement.  Venue for any legal action in connection herewith shall lie only Palm Beach County, Florida.

f.  Counterparts.  This Agreement may be executed in any number of counterparts, any one and all of which shall constitute the agreement of the parties, and each of which shall be deemed an original, but all of which together shall constitute one and the same document.

g.  Construction.  The parties acknowledge that they have had the opportunity to be represented by counsel in connection with the transactions contemplated herein and that this Agreement shall be interpreted according to its fair construction and shall not be construed more strictly against the non-drafting party.

h.  Invalidity.  If any provision in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

i.  Further Assurances.  In addition to the acts recited herein to be performed by Seller, Seller hereby agrees to perform at or after any closing all further acts as Purchaser may reasonably require to (a) evidence and vest in Purchaser the ownership of, and title to, the Property, and (b) consummate the transactions contemplated hereunder.  The terms and provisions of this section shall survive the Closing and shall remain in full force and effect after the Closing Date.

j.  Waiver.  No waiver by either party of any of its rights or remedies hereunder or otherwise shall be considered a waiver of any other subsequent right or remedy.  Except as expressly provided herein, no waiver by either party of any of its rights or remedies hereunder or otherwise shall be effective unless such waiver is evidenced in a written instrument executed by the waiving party.

k.  Severability.  If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby.  It is the intention of Seller and Purchaser that if any such provision is held to be illegal,

17

invalid, or unenforceable there shall be added in lieu thereof a provision as similar in terms to such provision as is possible and still be legal, valid and enforceable.

l.      Force Majeure.  In the event that the performance by either party is delayed due to Acts of God, unforeseen unusual governmental delay, governmental moratorium, war or civil disturbance, the deadline for completion of such performance shall be deemed extended to the extent reasonably required due to such condition.

21.     Duties of Escrow Agent.  Escrow Agent shall not be entitled to any fees or compensation for its services as escrow agent hereunder.  Escrow Agent shall be liable only to hold the Deposit, to invest same as provided for herein, and to deliver same to the parties named herein in accordance with the provisions of this Agreement.  Escrow Agent, as escrow agent, is acting in the capacity of a depository only, and shall not be liable or responsible to anyone for any damages, losses or expenses unless same shall be caused by the gross negligence or willful malfeasance of Escrow Agent.  In the event of any disagreement among any of the parties to this Agreement or among them or any of them and any other person, resulting in adverse claims and demands being made in connection with or for any Deposit involved herein or affected hereby, Escrow Agent shall be entitled to refuse to comply with any such claims or demands as long as such disagreement may continue, and in so refusing, shall make no delivery or other disposition of the Deposit then held by it under this Agreement, and in so doing Escrow Agent shall not become liable in any way for such refusal, and Escrow Agent shall be entitled to continue to refrain from acting  until (a) the rights of adverse claimants shall have been finally settled by binding arbitration or finally adjudicated in a court assuming and having jurisdiction of the Property involved herein or affected hereby, or (b) all differences shall have been adjusted by agreement and Escrow Agent shall have been notified in writing of such agreement signed by the parties hereto.

In the event that litigation is initiated relating to the Deposit, the parties hereto agree that Escrow Agent shall be held harmless from any attorney's fees, court costs and expenses relating to that litigation so long as the litigation does not arise as a result of Escrow Agent's negligence or failure to comply with the provisions of this Section 21.  To the extent that Escrow Agent holds the Deposit under the terms of this escrow, the parties hereto, other than Escrow Agent agree that the Escrow Agent may charge those funds with any such attorney's fees, court costs and expenses as they are incurred by Escrow Agent.  In the event that conflicting demands are made on Escrow Agent, or Escrow Agent, in good faith, believes that any demands with regard to the Deposit are in conflict or unclear or ambiguous, Escrow Agent may bring an interpleader action in an appropriate court.  Such action shall not be deemed to be the "fault" of Escrow Agent, and Escrow Agent may lay claim to or against the Deposit for its reasonable costs and attorneys fees in connection with same, through final appellate review.

22.     Recordation.  Concurrently with the execution of this Agreement, the parties shall execute the Memorandum of Agreement ("Memorandum"), attached hereto as **Exhibit "B,"** and the Release of Memorandum of Agreement ("Release"), attached hereto as **Exhibit "C."**  The Memorandum and Release shall be held in escrow by the Escrow Agent.  If Purchaser has not terminated the Agreement during the Inspection Period, the Memorandum shall be recorded in the Public Records of Palm Beach County.  However, if the Agreement is thereafter terminated pursuant to the terms of this Agreement, then the Release shall be recorded in the Public Records of Palm Beach County.

23.     Cooperation of Seller.  At no cost to Seller, Seller agrees to execute any applications to or filings with any applicable governmental agencies whose consent, approval or other official action may be required in connection with Purchaser's Intended Use of the Property.  Seller shall cooperate with and, upon request, actively support Purchaser's efforts to obtain all rezoning and comprehensive plan revisions, annexation, platting, road vacations, consents, licenses, permits, agreements, contracts, formal actions and other assurances by all Governmental Authorities and all other parties which may be required for Purchaser to

18

develop, use and occupy the Property for Purchaser's Intended Use.  Concurrently with the execution of this Agreement, Seller shall execute the Authorization of Property Owner attached as **Exhibit D**.

**[Signatures on following page]**

**THIS AGREEMENT HAS BEEN EXECUTED** and is effective as of the date it is fully executed by both parties and a fully-executed original is received by Purchaser (the "Effective Date").

"SELLER"                                          "PURCHASER"

BOCA RATON EXECUTIVE COUNTRY CLUB          TOLL SOUTHEAST LP COMPANY, INC.
CORP., a Florida corporation                      a Delaware corporation

By: _____                      By: _____
Name: _____                      Name: Alex Martin
Title: _____                      Title: Group President

Dated: __2/6/2024__, 2024                          Dated: __02/05/2024__, 2024

20

## EXHIBIT "A"
## LEGAL DESCRIPTION

All of the plat of HIDDEN VALLEY GOLF COURSE, according to the plat thereof, as recorded in Plat Book 25, Page 112 of the Public Records of Palm Beach County, Florida.

Said lands situate in City of Boca Raton, Palm Beach County, Florida, and containing 2,401,118 square feet (55.122 acres) more or less.

## EXHIBIT "B"
## MEMORANDUM OF AGREEMENT

This instrument prepared by and
after recording return to:
Thomas J. Smith, III, Esquire
Toll Brothers, Inc.
1140 Virginia Drive
Fort Washington, PA  19034

-------------------------{SPACE ABOVE THIS LINE FOR RECORDING DATA}----------------------------

### Memorandum of Contract

### (Hidden Valley Golf Course)

Toll Southeast LP Company, Inc., a Delaware corporation, ("Toll"), whose mailing address is 1140 Virginia Drive, Fort Washington, PA  19034 and  Boca Raton Executive Country Club Corp. a Florida corporation, whose mailing address is _____ ("Seller") hereby give record notice of the existence of an Agreement for the Sale and Purchase of Real Property ("Agreement") for purchase and sale of real estate located in Palm Beach County, Florida, whereby Toll, as buyer, has the right to purchase real property from Seller pursuant to the Agreement, signed by Toll and Seller and dated _____, 2024, as amended.  The real property subject to the Agreement is described on Exhibit "A" attached hereto and incorporated herein by reference.

[signatures follow]

22

Signed, sealed and delivered in the
presence of:

_Denise B_____

Print Name: _Denise Bourne_

_Randi Mannell_

Print Name: _Randi Mannell_

TOLL SOUTHEAST LP COMPANY, INC.

By_____

Name: Alex Martin
Title: Group President

(Corporate Seal)

STATE OF _FLORIDA_          )
                            )          SS
COUNTY OF _PALM BEACH_      )

The foregoing instrument was acknowledged before me, by means of ☑ physical presence or ☐ online notarization, this _8TH_ day of _FEB_ , 2024, by Alex Martin, the Group President of TOLL SOUTHEAST LP COMPANY, INC., a Delaware corporation, on behalf of the corporation

_Denise B_____

(Print Name _Denise Bourne_ )
NOTARY PUBLIC
State of _Florida_ at Large
Commission #_____
My Commission Expires:
Personally Known           ✓
or Produced I.D.           _____
[check one of the above]
Type of Identification Produced

_____

DENISE BOURNE
MY COMMISSION # HH 103838
EXPIRES: March 11, 2025
Bonded Thru Notary Public Underwriters

23

Signed, sealed and delivered in the
presence of:

Print Name:_____

Print Name:_____

**SELLER:**
Boca Raton Executive Country Club Corp.

By _____

Name: _____

Its: _____

(Corporate Seal)

STATE OF _Florida_ )
)  SS
COUNTY OF _Broward_ )

The foregoing instrument was acknowledged before me, by means of ☒ physical presence or ☐ online notarization, this _6_ day of _Feb_, 2024, by _Rae lynne Kotler_, the _President_ of _Boca Raton exec. CC a nCorp_, on behalf of the _Corporation_.

_____
(Print Name _Laurie Stumpo_)
NOTARY PUBLIC
State of _Florida_ at Large
Commission # _H H 391991_
My Commission Expires:
Personally Known _____
or Produced I.D. _FL DrLLc_
[check one of the above]
Type of Identification Produced
_Florida DL_

LAURIE JANE STUMPO
MY COMMISSION # HH 391991
EXPIRES: June 14, 2027

24

**Exhibit "A" to Memorandum of Agreement**

**Legal Description**

All of the plat of HIDDEN VALLEY GOLF COURSE, according to the plat thereof, as recorded in Plat Book 25, Page 112 of the Public Records of Palm Beach County, Florida.

Said lands situate in City of Boca Raton, Palm Beach County, Florida, and containing 2,401,118 square feet (55.122 acres) more or less.

**EXHIBIT "C"**
**RELEASE OF MEMORANDUM OF AGREEMENT**

This instrument prepared by and
after recording return to:
Thomas J. Smith, III, Esquire
Toll Brothers, Inc.
1140 Virginia Drive
Fort Washington, PA  19034

-------------------------{SPACE ABOVE THIS LINE FOR RECORDING DATA}-------------------------

**Memorandum of Contract**
**(Hidden Valley Golf Course)**

On _____, 2014, Toll Southeast LP Company, Inc., a Delaware corporation, ("Toll"), whose mailing address is 1140 Virginia Drive, Fort Washington, PA 19034 and  Boca Raton Executive Country Club Corp. a Florida corporation, whose mailing address is _____ ("Seller") recorded in the Public Records of Palm Beach County at Official Record Book _____, Page _____, that certain Memorandum of Agreement providing record notice of the existence of an Agreement for the Sale and Purchase of Real Property ("Agreement") for purchase and sale of real estate located in Palm Beach County, Florida, whereby Toll, as buyer, has the right to purchase real property from Seller pursuant to the Agreement, signed by Toll and Seller and dated _____, 2024, as amended.  The real property subject to the Agreement is described on **Exhibit "A"** attached hereto and incorporated herein by reference.  However, subsequent to the recording of the Memorandum, the Agreement was lawfully terminated, pursuant to the terms and conditions of the Agreement.  As such, Toll and the Seller hereby give record notice that the Agreement is no longer in effect, and Toll no longer has the right to purchase the real property described in Exhibit A pursuant to the Agreement.

[signatures follow]

Signed, sealed and delivered in the presence of:

_____
Print Name: DENISE BOURNE

_____
Print Name: Randi Marnell

TOLL SOUTHEAST LP COMPANY, INC.

By_____
Name: Alex Martin
Title: Group President

(Corporate Seal)

STATE OF FLORIDA )
                 )  SS
COUNTY OF PALM BEACH )

The foregoing instrument was acknowledged before me, by means of ☑ physical presence or ☐ online notarization, this 8th day of Feb, 2024, by Alex Martin, the Group President of TOLL SOUTHEAST LP COMPANY, INC., a Delaware corporation, on behalf of the corporation

_____
(Print Name DENISE BOURNE
NOTARY PUBLIC
State of Florida at Large
Commission #_____
My Commission Expires:
Personally Known        ✓
or Produced I.D.        _____
[check one of the above]
Type of Identification Produced

_____

DENISE BOURNE
MY COMMISSION # HH 103838
EXPIRES: March 11, 2025
Bonded Thru Notary Public Underwriters

27

Signed, sealed and delivered in the
presence of:

Print Name:_____

Print Name:_____

**SELLER:**
Boca Raton Executive Country Club Corp.

By _Thai Kurt_____
Name: _R Ae Kotler_____
Its: _Prenen t_____

(Corporate Seal)

STATE OF _Florida_ )
COUNTY OF _Broward_ )   SS

The foregoing instrument was acknowledged before me, by means of ☑ physical presence or ☐ online notarization, this _10_ day of _Feb_, 2024, by _Rae Kotler_, the _Pres_ of _Boca Raton Exec CC Corp   A Corp_, on behalf of the _Corporation_.

(Print Name _Laurie Stumpo_ )
NOTARY PUBLIC,
State of _Florida_ at Large
Commission # _HH 391991_
My Commission Expires:
Personally Known _____
or Produced I.D. _Drlic_
[check one of the above]
Type of Identification Produced
_Florida Drivers lic_

**LAURIE JANE STUMPO**
MY COMMISSION # HH 391991
EXPIRES: June 14, 2027

28

**Exhibit "A" to Release of Memorandum of Agreement**

<u>**Legal Description**</u>

All of the plat of HIDDEN VALLEY GOLF COURSE, according to the plat thereof, as recorded in Plat Book 25, Page 112 of the Public Records of Palm Beach County, Florida.

Said lands situate in City of Boca Raton, Palm Beach County, Florida, and containing 2,401,118 square feet (55.122 acres) more or less.

29

## EXHIBIT "D"
### (Authorization of Property Owner)

Boca Raton Executive Country Club Corp. a Florida corporation, the owner of the property described in **Exhibit "A"** attached hereto (the "Property") does hereby consent to and approve of Toll Bros., Inc. ("Toll"), its successors, assigns and delegates, submitting an application for an amendment to the City of Boca Raton's Future Land Use Map and Official Zoning Map changing the map designations that are assigned to the Property, as well as the submittal of any other development approvals to Toll, including but not limited to master plan/site plan approval and concurrency verification and approval. Additionally, this authorization shall also grant Toll the right to submit for approval any and all other development approvals to the governing Water Management District, the Florida Department of Transportation, the Florida Department of Environmental Protection or any other governmental agency having jurisdiction over the Property.

Boca Raton Executive Country Club Corp.

By: _____

Name: _____

Title: _____

STATE OF _Florida_ )
                          )          SS
COUNTY OF _Broward_ )

The foregoing instrument was acknowledged before me, by means of ☑ physical presence or ☐ online notarization, this _6_ day of _Feb_, 2024, by _Rae Kotler_, the _Pres_ of _Boca Raton Exc Cc_, a _FL corp_, on behalf of the _Corp_.

_____

(Print Name _Laurie Stumpo_ )

NOTARY PUBLIC,
State of _Florida_ at Large
Commission # _HH 391991_
My Commission Expires:
Personally Known _____
or Produced I.D. _____
[check one of the above]
Type of Identification Produced
_FL Drivers Lic_

LAURIE JANE STUMPO
MY COMMISSION # HH 391991
EXPIRES: June 14, 2027

30

<u>Exhibit "A" to Authorization of Property Owner</u>

**<u>Legal Description</u>**

All of the plat of HIDDEN VALLEY GOLF COURSE, according to the plat thereof, as recorded in Plat Book 25, Page 112 of the Public Records of Palm Beach County, Florida.

Said lands situate in City of Boca Raton, Palm Beach County, Florida, and containing 2,401,118 square feet (55.122 acres) more or less.

31

**<u>FIRST AMENDMENT TO AGREEMENT FOR</u>**
**<u>THE SALE AND PURCHASE OF REAL PROPERTY</u>**
**(Hidden Valley Golf Course)**

THIS FIRST AMENDMENT TO AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY (this "<u>Amendment</u>") is made and entered by and between Boca Raton Executive Country Club Corp., a Florida corporation ("<u>Seller</u>") and Toll Southeast LP Company, Inc., a Delaware corporation ("<u>Purchaser</u>").

RECITALS

A.    Seller and Purchaser entered into that certain Purchase and Sale Agreement dated February 8, 2024, as amended pursuant to that certain letter agreements between Seller and Purchaser dated February 23, 2024, February 28, 2024, March 13, 2024, March 27, 2024, April 5, 2024 and April 10, 2024 (collectively, the "Agreement"), pursuant to which Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, that certain real property more particularly described in the Agreement.

B.    Capitalized terms used herein but not defined herein shall have the meanings set forth in the Agreement.

C.    The parties have agreed to amend the Agreement as set forth below.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    <u>Recitals</u>. The recitals set forth above are true and correct and are incorporated herein by this reference.

2.    <u>Purchase Price</u>.  Section 3.a of the Agreement is hereby deleted in its entirety and replaced with the following:

"a.    <u>Amounts</u>.  Purchaser shall pay at Closing a purchase price for the Property a purchase price of ███████████████████████████ (the "<u>Purchase Price</u>"), subject further to the provisions in this Section 3(a).  Seller and Purchaser acknowledge that the Purchase Price has been calculated assuming Purchaser obtains the Required Approvals for development of the Property for the Intended Use comprised of ███████████ residential Lots.  If the Required Approvals authorize development of the Property for more or fewer than ███████████ residential Lots, the Purchase Price shall be increased or reduced by ███████████ ████████████████████████████████████ ███████████ for each Lot represented by the difference between ███████████ and the actual number of Lots approved; provided, however, in the event the Required Approvals authorize fewer than ███████████, Purchaser may either (i) waive the foregoing minimum Lot requirement and proceed to Closing, with a reduced Purchase Price being equal to ███████████,

DocuSign Envelope ID: A8DEAD58-BED3-47F8-A585-177711C462C0

or (ii) terminate this Agreement and receive a refund of the refundable portion of the Deposit (as hereafter defined) in accordance with Section 4, whereupon the parties shall thereafter be relieved of all further liability hereunder.  For example only and without any obligation for Purchase to achieve the following examples, (iii) if Purchaser obtains the Required Approvals for ██████████████ Lots, the Purchase Price shall be ███████████████████████████████; (iv) if Purchaser obtains the Required Approvals for ████████████ Lots, the Purchase Price shall be ███████████████████████████████; and (v) if Purchaser obtains the Required Approvals for ██████████ Lots and Purchaser elects option (i) above, the Purchase Price shall be ██████████.”

3.     <u>Inspection Period</u>.  Modifying Section 10 of the Agreement, the date of expiration of the Inspection Period is extended to August 20, 2024.

4.     <u>Miscellaneous</u>.

    a.     This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

    b.     This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors, assigns and legal representatives.

    c.     Except as expressly set forth in this Amendment, the Agreement shall remain unmodified and in full force and effect.  In the event of a conflict between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

    d.     This Amendment may be executed in any number of counterparts, each of which will be an original and all of which, taken together, will constitute one instrument. Facsimile and PDF signatures will be treated as original signatures.

**[Remainder of page intentionally blank]**

IN WITNESS WHEREOF, the parties have executed this Amendment and shall be dated effective as of the last of the signatures set forth below.

| "SELLER" | "PURCHASER" |
|---|---|
| **BOCA RATON EXECUTIVE COUNTRY CLUB CORP.,** a Florida corporation | **TOLL SOUTHEAST LP COMPANY, INC.** a Delaware corporation |
| By: | By: |
| Name: Rae Kotler | Name: Alex Martin |
| Title: President | Title: Group President |
| Dated: 4/15/2024 | Dated: 04-15-2024 |

3

## SECOND AMENDMENT TO AGREEMENT FOR
## THE SALE AND PURCHASE OF REAL PROPERTY
### (Hidden Valley Golf Course)

THIS SECOND AMENDMENT TO AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY (this "Amendment") is made and entered by and between Boca Raton Executive Country Club Corp., a Florida corporation ("Seller") and Toll Southeast LP Company, Inc., a Delaware corporation ("Purchaser").

### RECITALS

A.     Seller and Purchaser entered into that certain Purchase and Sale Agreement dated February 8, 2024, as amended pursuant to that certain letter agreements between Seller and Purchaser dated February 23, 2024, February 28, 2024, March 13, 2024, March 27, 2024, April 5, 2024 and April 10, 2024 (collectively, the "Agreement"), pursuant to which Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, that certain real property more particularly described in the Agreement.

B.     Capitalized terms used herein but not defined herein shall have the meanings set forth in the Agreement.

C.     The parties have agreed to amend the Agreement as set forth below.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Recitals. The recitals set forth above are true and correct and are incorporated herein by this reference.

2.     Inspection Period.  Modifying Section 10 of the Agreement, the date of expiration of the Inspection Period is extended to September 17, 2024.

3.     Miscellaneous.

    a.     This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

    b.     This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors, assigns and legal representatives.

    c.     Except as expressly set forth in this Amendment, the Agreement shall remain unmodified and in full force and effect. In the event of a conflict between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

d.      This Amendment may be executed in any number of counterparts, each of which will be an original and all of which, taken together, will constitute one instrument. Facsimile and PDF signatures will be treated as original signatures.

**[Signature page follows ]**

2

IN WITNESS WHEREOF, the parties have executed this Amendment and shall be dated effective as of the last of the signatures set forth below.

**"SELLER"**

**BOCA RATON EXECUTIVE COUNTRY CLUB CORP.**, a Florida corporation

By: _Rae Kotler_

Name: Rae Kotler

Title: President VP, Treasure Secty

Dated: 8/15/2024

**"PURCHASER"**

**TOLL SOUTHEAST LP COMPANY, INC.** a Delaware corporation

Signed by:

By: _Lily Rae_

B3A-0926FA93462...

Name: ~~Jonathan Carter~~  Lindsay Parsons

Title: ~~Division President~~ Vice President

Dated: 08-17-2024

3

**THIRD AMENDMENT TO AGREEMENT FOR
THE SALE AND PURCHASE OF REAL PROPERTY**
**(Hidden Valley Golf Course)**

THIS THIRD AMENDMENT TO AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY (this "Amendment") is made and entered by and between Boca Raton Executive Country Club Corp., a Florida corporation ("Seller") and Toll Southeast LP Company, Inc., a Delaware corporation ("Purchaser").

RECITALS

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated February 8, 2024, as amended pursuant to certain letter agreements between Seller and Purchaser dated February 23, 2024, February 28, 2024, March 13, 2024, March 27, 2024, April 5, 2024 and April 10, 2024, and as amended by First Amendment dated April 15, 2024 and Second Amendment dated August 17, 2024 (collectively, the "Agreement"), pursuant to which Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, that certain real property more particularly described in the Agreement.

B.      Capitalized terms used herein but not defined herein shall have the meanings set forth in the Agreement.

C.      The parties have agreed to amend the Agreement as set forth below.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Recitals. The recitals set forth above are true and correct and are incorporated herein by this reference.

2.      Inspection Period.  Modifying Section 10 of the Agreement, the date of expiration of the Inspection Period is extended to September 24, 2024.

3.      Miscellaneous.

  a.      This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

  b.      This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors, assigns and legal representatives.

  c.      Except as expressly set forth in this Amendment, the Agreement shall remain unmodified and in full force and effect.  In the event of a conflict between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

Docusign Envelope ID: 2B690D05-AA1F-4A32-BAE9-4767EDD300FC

2

d.      This Amendment may be executed in any number of counterparts, each of which will be an original and all of which, taken together, will constitute one instrument. Facsimile and PDF signatures will be treated as original signatures.

**[Signature page follows]**

IN WITNESS WHEREOF, the parties have executed this Amendment and shall be dated effective as of the last of the signatures set forth below.

"SELLER"

**BOCA RATON EXECUTIVE COUNTRY CLUB CORP.**, a Florida corporation

By: _____

Name: _R_n_e_ _K_o_t_l_e_R_____

Title: _P_r_e_s_._____

Dated: _9/16/2024_____

"PURCHASER"

**TOLL SOUTHEAST LP COMPANY, INC.** a Delaware corporation

By: _Jonathan Carter_____

Name: Jonathan Carter

Title: Division President

Dated: 09-16-2024

3

**FOURTH AMENDMENT TO AGREEMENT FOR**
**THE SALE AND PURCHASE OF REAL PROPERTY**
**(Hidden Valley Golf Course)**

THIS FOURTH AMENDMENT TO AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY (this "Amendment") is made and entered by and between Boca Raton Executive Country Club Corp., a Florida corporation ("Seller") and Toll Southeast LP Company, Inc., a Delaware corporation ("Purchaser").

RECITALS

A.      Seller and Purchaser entered into that certain Purchase and Sale Agreement dated February 8, 2024, as amended pursuant to certain letter agreements between Seller and Purchaser dated February 23, 2024, February 28, 2024, March 13, 2024, March 27, 2024, April 5, 2024 and April 10, 2024, and as amended by amendments dated April 15, 2024, August 17, 2024 and September __, 2024 (collectively, the "Agreement"), pursuant to which Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, that certain real property more particularly described in the Agreement.

B.      Capitalized terms used herein but not defined herein shall have the meanings set forth in the Agreement.

C.      The parties have agreed to amend the Agreement as set forth below.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Recitals. The recitals set forth above are true and correct and are incorporated herein by this reference.

2.      Intended Use. Modifying Section 1.k of the Agreement, the community shall be comprised of a minimum of sixty-six (66) Lots.

3.      Purchase Price. Modifying Section 3.a of the Agreement, the Purchase Price shall ███████ ████████████████████████████████████████████ ██████████████████

4.      Seller Credit for Offsite Improvements. At Closing, the Purchase Price shall be reduced by the cost to Purchaser to construction any offsite improvements required by the Required Approvals, including, without limitation, any offsite paths, turn lanes, tree mitigation, burying of powerlines, affordable housing requirements or anything else requested surrounding landowners and residents in connection or City and incorporated into the Required Approvals (collectively, the "Offsite Improvements") up to a maximum reduction of ███████████████████████████████████ (the "Offsite Credit"). The amount of the Offsite Credit shall be established by a bid obtained by Purchaser for construction of the Offsite Improvements from a reputable site development contractor and delivered to Seller at least fifteen (15) days prior to Closing.

5.    Inspection Period. Modifying Section 10 of the Agreement, the date of expiration of the Inspection Period is extended to October 1, 2024.

6.    Miscellaneous.

    a.    This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

    b.    This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors, assigns and legal representatives.

    c.    Except as expressly set forth in this Amendment, the Agreement shall remain unmodified and in full force and effect. In the event of a conflict between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

    d.    This Amendment may be executed in any number of counterparts, each of which will be an original and all of which, taken together, will constitute one instrument. Facsimile and PDF signatures will be treated as original signatures.

**[Signature page follows]**

2

IN WITNESS WHEREOF, the parties have executed this Amendment and shall be dated effective as of the last of the signatures set forth below.

"SELLER"

BOCA RATON EXECUTIVE COUNTRY
CLUB CORP., a Florida corporation

By: _____
Name: _____
Title: _____
Dated: _____

"PURCHASER"

TOLL SOUTHEAST LP COMPANY, INC.
a Delaware corporation

By: _____
Name: Jonathan Carter
Title: Division President
Dated: ___9/16/2024___

3

*R.f.*

## FIFTH AMENDMENT TO AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY
### (Hidden Valley Golf Course)

THIS FIFTH AMENDMENT TO AGREEMENT FOR THE SALE AND PURCHASE OF REAL PROPERTY (this "Amendment") is made and entered by and between Boca Raton Executive Country Club Corp., a Florida corporation ("Seller") and Toll Southeast LP Company, Inc., a Delaware corporation ("Purchaser").

### RECITALS

A.   Seller and Purchaser entered into that certain Purchase and Sale Agreement dated February 8, 2024, as amended pursuant to certain letter agreements between Seller and Purchaser dated February 23, 2024, February 28, 2024, March 13, 2024, March 27, 2024, April 5, 2024 and April 10, 2024, and as amended by and as amended by First Amendment dated April 15, 2024, the Second Amendment dated August 17, 2024, the Third Amendment dated September 16, 2024 and the Fourth Amendment dated September 16, 2024 (collectively, the "Agreement"), pursuant to which Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, that certain real property more particularly described in the Agreement.

B.   Capitalized terms used herein but not defined herein shall have the meanings set forth in the Agreement.

C.   The parties have agreed to amend the Agreement as set forth below.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   Recitals. The recitals set forth above are true and correct and are incorporated herein by this reference.

2.   Tolling. All time periods for the performance of obligations under the Agreement are hereby suspended and tolled until December 31, 2024.

3.   Miscellaneous.

   a.   Seller is, and at Closing will be, authorized and permitted to enter into this Amendment and to perform all covenants to be performed by Seller under the Agreement as amended by this Amendment. Seller's right to execute this Amendment is not limited. The individual executing this Amendment on behalf of



Seller has all necessary power and authority to so execute this Amendment and to bind Seller to the terms hereof.

b.   This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

c.   This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors, assigns and legal representatives.

d.   Except as expressly set forth in this Amendment, the Agreement shall remain unmodified and in full force and effect. In the event of a conflict between the provisions of the Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.

e.   This Amendment may be executed in any number of counterparts, each of which will be an original and all of which, taken together, will constitute one instrument. Facsimile and PDF signatures will be treated as original signatures.

**[Signature page follows]**

2

*RK*

IN WITNESS WHEREOF, the parties have executed this Amendment and shall be dated effective as of the last of the signatures set forth below.

"SELLER"

BOCA RATON EXECUTIVE COUNTRY
CLUB CORP., a Florida corporation

By: _Ra Ku_
Name: _Rhe Kotler_
Title: _pres. Dev_
Dated: _9/30/2024_

"PURCHASER"

TOLL SOUTHEAST LP COMPANY, INC.
a Delaware corporation

By: _____
Name: Jonathan Carter
Title: Division President
Dated: _10-1-24_

3